UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | Case Nos. | 3:17cr168(JAM) |
| | : | | 3:18cr32(JAM) |
| v. | : | | |
| | : | | |
| THOMAS HEAPHY, JR. | : | April 26, 2018 | |

## Government's Sentencing Memorandum

The defendant, Thomas Heaphy, Jr., is a serial fraudster who bilked unsuspecting investors out of millions of dollars in two separate schemes. For over five years, Mr. Heaphy spent nearly every day pitching worthless stocks as part of a "pump and dump" scheme that caused more than 12,000 victims to lose, collectively, nearly $19 million. After learning he was under investigation, Mr. Heaphy embarked on a new scheme that caused losses of over $1.2 million to a dozen investors (some of whom already had been victimized in the first scheme). These are actual losses to real people, more than 800 of whom took the time to submit Victim Impact Statements to the Court. These victims deserve justice. Given the exceptionally high degree of victim impact and the serial nature of Mr. Heaphy's crimes, the Government respectfully requests that the Court impose a sentence of 78 months of imprisonment, which is the top of the applicable Sentencing Guidelines range.

## I.    Factual Background

The facts underlying Mr. Heaphy's convictions are set out accurately in the presentence report ("PSR"), and adopted by the Government with certain supplementary details and supporting exhibits as follows.

1

A.      The "Pump and Dump" Scheme

Between January 2011 and July 2016, Mr. Heaphy participated in a stock market manipulation scheme involving the fraudulent promotion and sale of certain "microcap" and "penny" stocks (the "Subject Securities") that were publicly traded on the over-the-counter market. The issuing companies, which Mr. Heaphy knew to be shell companies with no legitimate business activities, included Terra Energy Resources Ltd. (stock symbol "TRRE"); Mammoth Energy Group, Inc. (stock symbol "MMTE"), a company that later became Strategic Asset Leasing Inc. (stock symbol "LEAS"); Trilliant Exploration Corporation (stock symbol "TTXP"); Hermes Jets, Inc. (stock symbol "HRMJ"), which later became Continental Beverage Brands Corporation (stock symbol "CBBB"); Dolat Ventures, Inc. (stock symbol "DOLV"); and Fox Petroleum, Inc. (stock symbol "FXPT").

Mr. Heaphy's role in the scheme was to pitch the Subject Securities to prospective investors. During these pitches, Mr. Heaphy knowingly lied to prospective investors about the projected and actual performance of the Subject Securities, the financial health and prospects of the issuing companies, and how investor funds would be used. For instance, Mr. Heaphy falsely assured some investors they would "double" their money, or that the stock price would rise from a few pennies to $1 or $2 per share, even though he knew the underlying securities were worthless. Mr. Heaphy also falsely told some investors that he would make money only if they did, and concealed from investors that substantially all their money was going to him and his co-conspirators, who included Christian Meissenn

2

and William Lieberman (the scheme's leaders); Damian Del Gado and Brian Ferraioli (the other stock promoters); and Corey Brinson and Diane Dalmy (attorneys who facilitated the unlawful securities transactions and laundered the scheme's proceeds through their trust accounts). As Mr. Heaphy knew, investors who purchased the Subject Securities did not even receive their share certificates in some instances.

In furtherance of the scheme, Mr. Heaphy conducted "matched trades" to ensure (to the extent possible) that investors who purchased the Subject Securities on the open market bought shares that were sold by his co-conspirators (and not by other investors). This was absolutely key to the profitability of the scheme, and required Mr. Heaphy (and the other promoters) to coordinate the timing of victim investors' purchases with the conspirators' sales.

In addition, trading under his wife's name, Mr. Heaphy sometimes purchased small quantities of the Subject Securities at above-market prices at the end of the trading day in order to "mark the close." This was important to the scheme, because after the trading day ended, investors saw only the stock's closing price. Thus, when trading began the next morning, Mr. Heaphy's machinations made it appear there had been an uptick in the share price. For example, between February 2014 and November 2015, Mr. Heaphy spent about $2,700 buying approximately 111,000 shares of LEAS in 65 transactions. (Mr. Heaphy also sold some of these shares during the same period to offset his losses.) More specifically, among other transactions, on February 19, 2015, Mr. Heaphy bought 200 shares of LEAS at $0.39 per share at the end of the trading day. The average price that day was $0.30. The next day, Mr.

Heaphy bought 400 shares at $0.38 per share. The average that day was $0.29. On February 23, 2015 (the next business day), Mr. Heaphy bought 100 shares at $0.35, compared to an average price that day of $0.30.[1] These small purchases helped Mr. Heaphy to fraudulently market the stocks to victim investors as promising investments.

As described below, the Government estimates that 12,764 victim investors suffered net losses of $18,789,364 as a result of this scheme. Although Mr. Heaphy personally solicited only a small percentage of the victims, he was keenly aware that others were solicited by his co-conspirators. In fact, Mr. Heaphy and Mr. Del Gado sometimes coordinated their efforts to avoid soliciting the same investors. *See* Ex. 1. And Mr. Heaphy and Mr. Ferraioli worked together closely as partners in the scheme; they shared leads, introduced one another to promising investors, often called the same investors to reinforce each other's lies, and split commissions. Apart from the promoters, Mr. Heaphy understood that, in order to reach a wider audience, Mr. Meissenn and Mr. Lieberman were publishing false press releases and distributing false promotional materials (including via email blasts and hardcopy mailers) for the Subject Securities and the issuing companies, all of which was intended to, and did, induce investors to purchase the Subject Securities. The defendant also regularly checked the Subject Securities' tickers and was aware of price changes and sales

---

[1] The trade information in this paragraph (and elsewhere in this memorandum) is derived from an analysis of transactional data obtained from the Securities and Exchange Commission. The underlying data has been provided to defense counsel.

4

volumes. Hence, he was able to see how his (and his co-conspirators')
misrepresentations affected purchases and sales of the Subject Securities.

As an example of how the scheme worked, in early April 2014, Mr. Meissenn
paid for 50,000 flyers touting MMTE to be mailed to prospective investors. *See* Ex. 2.
The flyers claimed (with no basis in fact) that "MMTE is posed for a massive move
higher" and "could soar 400% within a week." Ex 3. On April 7, 2014, Mr. Lieberman
put out a fraudulent press release for MMTE. The release announced that MMTE
had signed a valuable options contract for iron mining rights in Canada:

> "This is our first step of many in a new direction," said William
> Lieberman, President of Mammoth Energy Group. "It has taken a long
> time to finally be able to move the company forward, and Mammoth will
> be continuing to look to invest in larger North American projects that
> are in or close to production. In the upcoming weeks we will be
> announcing further developments as we seek to build a transparent,
> cash flowing company that will build value over time. We expect to close
> out this first initial option agreement in a very short time frame and
> have commitments already lined up for this acquisition. This project has
> been in development for more than ten years and I have followed it
> closely for a long time. There is a ton of material available on the project
> and I would encourage shareholders to look to see the depth, financial
> commitments, and the level of expertise that has moved this project
> forward in Canada. This is a long term investment with a significant
> valuation."

*See* Ex. 4. The next day, investors bought nearly 2.4 million shares of MMTE, up from
just 120,000 shares on April 3, 2014—a 20-fold increase. Yet there never was any
intent for MMTE to be a legitimate mining company. In fact, on November 12, 2014,
MMTE announced a reverse split (diluting all outstanding shares by 500:1) and
changed its name to LEAS to reflect that it was pivoting away from mining and
toward equipment leasing. *See* Exs. 5-6. In that time (*i.e.*, between April 8, 2014, and

November 12, 2014), investors bought approximately 460 million shares of MMTE on the open market for a total cost of about $6.2 million. Mr. Heaphy was actively pitching MMTE during this period. One victim who was solicited by Mr. Heaphy (and Mr. Ferraioli) purchased 100,000 shares of MMTE on April 22, 2014 (at a cost of $1,500) and another 100,000 shares on July 17, 2014 (at a cost of $1,020). Another victim who was solicited by Mr. Heaphy (and Mr. Ferraioli) purchased 2 million shares of MMTE on July 28, 2014 (at a cost of $20,200).[2] All of these fraudulent promotional devices—the flyers, the press releases, the telephone solicitations—were mutually reinforcing.

The scheme was extremely profitable for Mr. Heaphy and his co-conspirators. Each promoter received approximately 25% of all money that he personally "brought in the door," *i.e.*, that he (as opposed to other conspirators) caused investors to pay toward the purchase of the Subject Securities.[3] Mr. Heaphy's personal gain from the scheme was $719,000 (meaning that he was personally responsible for $2,876,000 in illegal sales). Mr. Meissenn and Mr. Lieberman (the scheme's leaders) made almost $4.4 million and $1.2 million, respectively. Mr. Ferraioli and Mr. Del Gado (the other promoters) made about $1.25 million and $350,000, respectively. Mr. Brinson's cut was $200,000, while Ms. Dalmy made about $30,000. The total gain to the charged

---

[2] These two victims were interviewed by the Government. The interview memoranda previously have been shown to counsel for Mr. Heaphy.

[3] Because Mr. Heaphy and Mr. Ferraioli worked as partners, they typically split a 50% commission, with each receiving one-quarter of a victim's investment. Most often, Mr. Meissenn would pay the entire 50% commission to Mr. Ferraioli (usually via a check or wire from Mr. Brinson's attorney trust account), and Mr. Ferraioli then would write Mr. Heaphy a check for his share.

conspirators thus was approximately $8.1 million—a huge percentage (about 43%) of the total loss.

Mr. Heaphy attempted to evade the correct calculation and payment of taxes on his income by, among other means, arranging for the funds to be deposited into bank accounts in the name of his wife and a shell company under his control (SR Leads, LLC). From there, the defendant withdrew a significant portion of the funds in cash. (Mr. Heaphy's wife does not share a last name with him, which made it even harder to discern the true ownership of the funds.) As a result of these affirmative acts, the defendant evaded $147,345 in income taxes due to the Internal Revenue Service ("IRS").

## B.    The Waters Club Scheme

In July 2016, Mr. Heaphy learned that he (like his co-conspirators) was under investigation for his involvement in the above-described "pump and dump" scheme. Beginning the next month, and continuing until February 2017, the defendant and Mr. Ferraioli (again working as partners) embarked on a new fraudulent scheme to promote and sell the securities of Waters Club Worldwide, Inc. and Waters Club Holdings, Inc. (collectively, "Waters Club"). Unlike the issuers involved in the "pump and dump" scheme, Waters Club was not a shell company, in that Waters Club provided yacht charter services to customers.

The defendant and Mr. Ferraioli solicited prospective investors to purchase shares of Waters Club stock purportedly in advance of a public offering. According to the defendant and his co-conspirators, Waters Club was seeking to expand beyond

charter services, and intended to form a membership-based "time share" club with a fleet of yachts that members jointly owned and could use for yachting vacations.

The defendant and his co-conspirators made certain material misrepresentations to prospective investors in order to induce those prospective investors to purchase stock in Waters Club. Among other things, the defendant misrepresented that he and Mr. Ferraioli were being compensated with Waters Club stock for recruiting investors in lieu of commissions or other payments. This lie made investors believe that the promoters' interests aligned with the investors' own interests.[4] In truth, the defendant and Mr. Ferraioli were compensated not with stock, but with approximately half of all money paid by investors for shares of Waters Club. The defendant's interests thus did not align with the interests of investors, and a substantial portion of investors' money thus was not used to develop the business of Waters Club. Some of the investors interviewed by the Government specifically

---

[4] Mr. Heaphy states that he was told by the Chief Executive Officer of Waters Club that he would "in fact receive Waters Club stock," in addition to commission payments. *United States v. Thomas Heaphy, Jr.*, No. 3:18cr32(JAM), Def.'s Supp. Sentencing Mem. (Doc. No. 13) at 7 (hereinafter, "Def.'s Supp. Mem."). The Government cannot confirm whether or not this is true. However, given the defendant's sophistication and experience with securities, it seems unlikely he had a realistic expectation of being compensated with stock. Moreover, it is undisputed that he misled investors about his receipt of commissions.

The defendant also states that he and Mr. Ferraioli did disclose to one investor that they were receiving a commission (albeit not the amount of the commission). *See id.* In fact, they told the victim that they were receiving a commission (which the victim assumed, based on his prior knowledge of the industry, to be between 5% and 8%), but also that they were primarily being compensated with Waters Club stock, which was not true. This victim, when interviewed during the Government's investigation, specifically stated he never would have invested in Waters Club had he known that 50% of his money was going to the promoters.

reported that they would not have invested had they known the promoters were receiving commissions (especially of 50%) rather than stock.

In total, the defendant and Mr. Ferraioli jointly recruited 12 investors to pay a total of $1,289,500 for shares of Waters Club stock. These shares were (and remain) restricted, meaning that they cannot be freely transferred. Due in part to the payments to Mr. Heaphy and Mr. Ferraioli, which totaled $605,204, Waters Club lacked the capital to develop its membership-based club. As a result, Waters Club did not complete a public offering, and the shares held by the victim investors are unsalable.

The defendant's gain from this scheme was $307,658, which he had Waters Club pay into a bank account the defendant controlled through a shell company (Nautical Concepts, Inc.).[5] The defendant concealed the nature of these commission payments by invoicing Waters Club for, among other things, "consulting fees," "fleet expansion," and "acquisition due diligence." *See* Ex. 7.

At least six of the Waters Club investors recruited by the defendant and Mr. Ferraioli also were victims of the "pump and dump" scheme. One of the victims of the Waters Club scheme (as well as the "pump and dump") was a Connecticut resident who, after being solicited by the defendant and Mr. Ferraioli, paid $475,000 to Waters Club.

---

[5] Mr. Ferraioli's gain was $297,546.

## II.    Procedural Background

In mid-July 2016, the Government's investigation into the "pump and dump" scheme became overt when court-authorized search warrants were executed at, among other locations, Mr. Meissenn's home and Mr. Brinson's law office. Mr. Heaphy learned of the investigation shortly thereafter. Several of Mr. Heaphy's co-conspirators (but not Mr. Heaphy himself) were formally notified that they were targets of the investigation.

Mr. Heaphy and Mr. Ferraioli began fraudulently promoting Waters Club stock in August 2016, and continued until February 2017. In early March 2017, Mr. Heaphy was formally notified that he, too, was a target of the "pump and dump" investigation. He promptly informed the Government that he wished to accept responsibility for his actions and, on July 28, 2017, he waived indictment and pleaded guilty to a two-count Information charging him with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, and tax evasion, in violation of 26 U.S.C. § 7201. *See United States v. Thomas Heaphy*, No. 3:17cr168(JAM) (the "2017 Case").

In early September 2017, the Government learned of the Waters Club scheme through a whistleblower. On November 30, 2017, a Grand Jury in Hartford, Connecticut, returned an indictment against the Chief Executive Officer of Waters Club. *See United States v. Andrew Deme*, No. 3:17cr265(JAM). Within days, the Government notified Mr. Heaphy that he, too, was a target of the Waters Club investigation. On February 22, 2018, Mr. Heaphy waived indictment and pleaded guilty to a one-count Information charging him with conspiracy to commit mail and

10

wire fraud, in violation of 18 U.S.C. § 1349. *See United States v. Thomas Heaphy, Jr.*, No. 3:18cr32(JAM) (the "2018 Case").

## III.  Loss Calculation

As to the "pump and dump" scheme, the Government's loss calculation began with trade data ("blue sheets") obtained from the Securities and Exchange Commission. The blue sheets show all open-market purchases and sales in the Subject Securities from January 2011 through December 2016. The Government then netted out investors' losses and gains, including across securities. Any investor in a net loss position (of ≥ $1) was treated as a victim. Anyone in a net gain position was not considered to be a victim. *See United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) (requiring netting).[6] Next, the Government added all known "private placement" victims, *i.e.*, investors who purchased securities directly from the issuers by sending money to Mr. Brinson (in his capacity as corporate counsel for certain of the issuing companies). The resulting actual loss amount is $18,789,364 to 12,764 identifiable victims.[7]

The Government believes this is a "reasonable estimate" of the loss. U.S.S.G. § 2B1.1, comment. (n. 3(C)). That said, the Government's approach is both over- and

---

[6] For example, if an investor lost $500 on a TRRE investment but gained $1,000 on an LEAS investment, that investor's final position was a net gain of $500, so the investor was not considered to be a victim. Conversely, if an investor lost $800 on TRRE, but gained $200 on LEAS, the investor was considered to be a victim with a net loss amount of $600.

[7] The Government also excluded any investor known to be an alias, nominee, or affiliate of the conspirators (although virtually all these investors were net "winners" anyway). And the Government excluded any investor for whom the blue sheets did not provide sufficient personal identifying information (*e.g.*, the blue sheets listed only "U.S. Customer Account" at a foreign bank).

11

underinclusive in certain respects. It is over-inclusive because it includes losses beyond the end date of the charged offense. Mr. Heaphy pled to a conspiracy offense ending in July 2016. The blue sheets show trade data through December 2016. Hence, the blue sheets may include some losses to investors who purchased securities after July 2016. Mr. Heaphy is responsible for these losses because he helped set into motion the catalyzing events before the Government disrupted the conspiracy. *Cf. United States v. Paladino*, 401 F.3d 471, 479 (7th Cir. 2005) ("[A] defendant who sets in motion a train of events foreseeably inflicting losses that in fact materialize cannot escape responsibility by quitting, let alone by being expelled from, the conspiracy."). But even if not, the scope of losses postdating July 2016 appears to be relatively small (under $100,000). The Government's approach also is underinclusive insofar as it does not include brokerage fees, which are not discernible from the blue sheets. For these reasons, $18,789,364 is merely a reasonable estimate of loss, not a precise loss amount.

The Sentencing Guidelines provide that, in a market manipulation case, "the court in determining loss may use any method that is appropriate and practicable under the circumstances." U.S.S.G. § 2B1.1, comment. (n. 3(F)(ix)). The Guidelines further explain that, in determining whether a particular approach produces a "reasonable estimate" of loss, a court may (but is not required to) consider the effect of external market forces and other factors. *Id.* The Second Circuit has faulted district courts for failing to do so in market manipulation cases involving otherwise-legitimate securities (*i.e.*, securities issued by companies with actual business

operations). *See United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013); *see also United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007) (vacating sentence based on lower court's failure to determine "the amount of the loss caused by the fraud without even considering other factors relevant to a decline" in the stock). But there is authority for not considering external market forces in "pump and dump" schemes involving shell companies. *See United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007). This is because shell companies have "no underlying equity" and are therefore presumed to be valueless regardless of broader economic factors. *Id.* That is the approach the Government urges here.

The Government believes that the full scope of loss was reasonably foreseeable to Mr. Heaphy. Not every victim investor was personally solicited by Mr. Heaphy or the other promoters.[8] But the mix of false information the conspirators put into the market infected every trade. By publishing press releases, sending out email blasts and hardcopy mailers, cold-calling investors, and other means, the conspirators flooded the market with false and misleading information about the Subject Securities. Predictably, that information then was further disseminated through internet chat rooms and stock tips. All of this not only was foreseeable to Mr. Heaphy, but was a critical part of the scheme.

---

[8] That said, the losses suffered by investors who *were* directly solicited by the promoters is about half of the total loss amount here. Each promoter earned about 25% of the investor funds he personally brought in the door, and collectively the three promoters earned about $2,319,000. Hence, the promoters directly solicited approximately $9,276,000 in investor funds as part of the charged scheme.

As to the Waters Club scheme, Mr. Heaphy and Mr. Ferraioli brought in about $1,289,500 in investor funds. As a result of the conspirators' actions, the investors' shares are now unsalable, meaning that they are worthless. And as noted above, the tax loss in this case is $147,345. Hence, the total actual loss across all three crimes of conviction is $20,226,209.

## IV.   Victim Notification and Restitution

The Government sent letters to, or otherwise notified, all identifiable victims. The Government asked that, if a victim wished to be heard in connection with sentencing or to receive restitution, the victim submit a Victim Impact Statement, along with supporting documentation. In response, the Government received impact statements from over victims of the "pump and dump" scheme. In addition, the Government interviewed and/or received bank records and other documents from a number of victims who did not submit impact statements. Hence, although the total loss resulting from this scheme is approximately $18,789,364 to 12,764 victims, the Government is seeking restitution on behalf of 860 victims in the total amount of $5,301,694.

In some instances, there was a discrepancy between the amount a victim claimed in his or her impact statement and the loss reflected in the blue sheets. Accordingly, the Government and a Probation Officer jointly reviewed each file where there was a discrepancy of $50 or more (assuming a lesser amount to be attributable to brokerage fees). In general, the Government and the Probation Officer found that most discrepancies resulted from victims overestimating their losses, including losses

14

outside the charged period, claiming losses for stocks other than the Subject Securities, or failing to account for offsetting gains. There were some instances, however, in which victims were able to substantiate higher losses than the blue sheets showed; most commonly, this occurred when victims provided evidence either of brokerage fees or of trading losses incurred in brokerage accounts they held under different names. After this reconciliation process, the Government believes that $5,301,694 (rather than the lower amount reflected in the blue sheets, or the higher impact reflected in the Victim Impact Statements) is the correct restitution figure as to the "pump and dump" scheme. In addition, $1,289,500 is owed in restitution to the 12 victims of the Waters Club scheme, and $147,345 is owed to the IRS (to be paid only after the other victims are fully made whole, *see* 18 U.S.C. § 3664(i)). Thus, the defendant's total restitution obligation is $6,738,539.

## V.   Sentencing Guidelines

The Sentencing Guidelines calculation in the PSR is correct. The defendant's three convictions are grouped together under U.S.S.G. § 3D1.2(d). The Guidelines calculation under U.S.S.G. § 2B1.1 for defendant's fraud offenses produces a higher offense level than the Guidelines calculation under U.S.S.G. § 2T1.1 for the tax evasion offense. As a result, U.S.S.G. § 2B1.1 is used to determine the applicable Guidelines range. U.S.S.G. § 3D1.3(b).

The base offense level under U.S.S.G. § 2B1.1 is 7. Twenty levels are added because the total loss amount ($20,226,209) is more than $9.5 million but less than $25 million. U.S.S.G. § 2B1.1(b)(1)(K). Two levels are added under U.S.S.G. §

2B1.1(b)(2)(A) because the two fraud offenses involved 10 or more victims (both individually and collectively). Two more levels are added because the "pump and dump" scheme involved the use of sophisticated means, including the funneling of the scheme's proceeds through nominee bank accounts and the defendant's practice of arranging "matched trades" and "marking the close."[9] U.S.S.G. § 2B1.1(b)(10)(C). Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, resulting in a total offense level of 28. Because Mr. Heaphy falls within Criminal History Category I, the applicable Guidelines range is 78 to 97 months of imprisonment.

That said, while the Government has an obligation to inform the Court of the facts of this case (including as to loss), the Government respectfully requests that the Court vary or depart downward to a total offense level of 26. As described in the parties' plea agreement in the 2017 Case, Mr. Heaphy agreed in principle to plead guilty in that case at a time when the Government had not yet completed its loss analysis. *See United States v. Thomas Heaphy, Jr.*, No. 3:17cr168(JAM), Plea

---

[9] The Court expressed concern during Mr. Del Gado's sentencing hearing about possible overlapping Guidelines and questioned whether it is "really possible to have an offense that involves the kind of multi-million dollar loss we have here without having . . . sophisticated means or . . . more than ten victims? Certainly sophisticated means seems to be very closely aligned here with the size of the fraud." *United States v. Damian Del Gado*, No. 3:17cr93(JAM), Sentencing Tr. (Doc No. 31) at 88. The Court also asked whether "channeling one's monies to one's wife or daughter's bank account, is that really sophisticated?" *Id.* at 89. Here, there are other bases for the sophisticated means enhancement beyond the defendant's method of transferring money, *i.e.*, the defendant's practice of "marking the close" and arranging "matched trades," both of which require a high degree of knowledge and sophistication as to stock market manipulation. Moreover, although the Waters Club scheme involved a dozen victims and over $1 million in losses, the Government is *not* taking the position in this or any related case that the 2018 Case involved sophisticated means. *See also United States v. Andrew Deme*, No. 3:17cr265(JAM), Plea Agreement (Doc. No. 29) at 4-5.

Agreement (Doc. No. 5) at 7. At the time, the total loss amount the Government believed it could prove by a preponderance of the evidence was more than $3.5 million but less than $9.5 million.[10] That loss amount would result in a total offense level of 26 (rather than 28) and a corresponding Guidelines range of 63 to 78 months of imprisonment. Despite the defendant's intervening conviction in the 2018 Case, the Government wishes to stand by its agreement.

## VI.    Discussion

The Government respectfully submits that a sentence of 78 months would be sufficient but not greater than necessary to serve the aims of sentencing in this case. That is tied to the top of the Guidelines range after the variance or departure requested by the Government.

### A.    Seriousness of the Offense

Mr. Heaphy's crimes were extremely serious. He actively participated in the "pump and dump" scheme for five-and-a-half years. During that time, he spent countless hours pitching junk stocks to investors. The scheme harmed over 12,000 victims, resulting in losses of nearly $19 million and gains to the perpetrators of more than $8 million. Mr. Heaphy personally brought in about $2,876,000 in sales and netted $719,000 of other people's money. He concealed his earnings from the IRS by laundering the money through nominee bank accounts in the names of his wife and a shell company under his control.

---

[10] Although Mr. Heaphy did not enter his guilty pleas in the 2017 Case until July 28, 2017, he communicated his willingness to plead guilty months earlier. The intervening time was necessary for the Government to complete its analysis of Mr. Heaphy's tax liability.

The most serious aspect of this crime is the effect on investors. As reflected in the victim impact statements submitted to the Court, some investors lost their retirement savings. A 72-year-old retiree was forced to return to work driving a school bus. Other victims lost their grandchildren's college funds. An 84-year-old victim was planning to use the money he lost to pay for an assisted living facility. These are the devastating consequences of the defendant's crime.

It is striking that, in the roughly 350 pages of the loss chart, there are no (or virtually no) corporate names.[11] The victims in this case are people, not companies. To be sure, not every victim was harmed to the same degree. 4,926 victims lost $100 or less, and 10,478 lost $1,000 or less. But 2,286 victims lost more than $1,000 (a total of about $16.5 million), and 368 lost $10,000 or more (a total of about $10.8 million). At the highest tier, 42 victims lost $50,000 or more (a total of about $4.5 million). The fact that more than 800 victims went to the effort of submitting impact statements and restitution claims to the Court shows just how much the money Mr. Heaphy and his co-conspirators stole meant to them.

It is especially galling that, immediately after learning of the "pump and dump" investigation, Mr. Heaphy pivoted to a *new* fraudulent scheme. Although there are differences between the 2017 Case and the 2018 Case, in both instances Mr. Heaphy and his co-conspirators (including Mr. Ferraioli) swindled investors in order to line their own pockets. Worse, Mr. Heaphy ripped off some of the exact same

---

[11] The loss chart is attached to the PSR.

investors in both schemes, making them victims twice-over. Indeed, the Connecticut victim who lost $475,000 in the Waters Club scheme already had lost $101,000 in the "pump and dump" scheme.[12] And the Waters Club scheme was incredibly profitable for the perpetrators: in just over six months, Mr. Heaphy and Mr. Ferraioli fleeced investors out of almost $1.3 million, taking home over $600,000 between the two of them. Although the Government credits Mr. Heaphy's efforts to set aside some money for restitution in advance of sentencing (about $3,200, *see* Def.'s Supp. Mem. at 9), it is hard to understand what happened to all of his ill-gotten gains in such a short period of time.

Mr. Heaphy also sought to mislead prospective Waters Club investors about his prior involvement in the "pump and dump" scheme. For example, on February 1, 2017, Mr. Heaphy participated in a telephone call with an investor who lost about $68,000 on LEAS and CBBB stock.[13] During the call, Mr. Heaphy said that he had "just read" about Mr. Brinson's conviction and had been "so disgusted" to learn that "all the legal opinions and the documents . . . weren't real. The companies . . . weren't real." Ex. 8 at 1-2. Mr. Heaphy feigned ignorance and outrage that the Subject Securities were "tied into a huge scam." *Id.* at 2. Without missing a beat, Mr. Heaphy said he hoped to "do more business going forward" with the investor on Waters Club, suggesting that the victim could recoup his prior losses with Waters Club stock. *Id.* at 1.

---

[12] The Government expects this victim to be present at Mr. Heaphy's sentencing hearing.

[13] The call was recorded by the victim at the direction of law enforcement.

### B.    Relative Culpability

The Government acknowledges that Mr. Heaphy is not the most culpable member of the "pump and dump" scheme, but neither is he the least culpable. During Mr. Brinson's sentencing, the Government sought to outline its view of the relative culpability of the scheme's members:

> There's no question Mr. Brinson is less culpable than Mr. Meissenn, is less culpable I believe than the other principal of the scheme, the other organizer. I think in important ways he's even less culpable than the salesmen, although it's a smaller margin. He profited less than the salesmen did. He didn't directly solicit investors and therefore he didn't lie directly to them, although certainly he did through the fraudulent opinion letters. I think it probably takes a different kind of person to speak directly to an investor, you know their age, you know their financial circumstances, and to lie directly to that person than to do what Mr. Brinson did. I think it takes a different kind of person. So on balance, I do think that Mr. Brinson was less culpable than those other participants in the scheme.
>
> There is, of course, a way in which he was more culpable. And this is part of why we're sort of comparing apples to oranges. And that's because, as an attorney with his training and his experience, he absolutely should have known better.

*United States v. Corey Brinson*, No. 3:17cr9(JAM), Sentencing Tr. (Doc. No. 31) at 80-81. That hierarchy still holds true. As the leaders of the scheme, Mr. Meissenn and Mr. Lieberman are the most culpable parties. Despite their flagrant abuse of their positions as attorneys, Mr. Brinson (who was sentenced to 36 months of imprisonment) and Ms. Dalmy (who will be sentenced eight days after Mr. Heaphy) are the least culpable for reasons that were discussed at length during Mr. Brinson's sentencing and will be further explained at Ms. Dalmy's sentencing.

20

The promoters—Mr. Heaphy, Mr. Ferraioli, and Mr. Del Gado—occupy the middle ground. They earned considerably more than Mr. Brinson ($200,000) and Ms. Dalmy ($30,000), and crucially, they lied to investors every day. Unlike the attorneys, the promoters also were serial fraudsters. Mr. Del Gado (who was sentenced to 84 months of imprisonment) had a prior federal conviction stemming from a similar stock swindle. Although Mr. Heaphy and Mr. Ferraioli have no relevant criminal history, they went straight from the "pump and dump" scheme to the Waters Club scheme, twice defrauding some of the same victims. And at least in Mr. Brinson's case, there were significant mitigating factors that are not present here, such as Mr. Brinson's military service; his history of community involvement and volunteerism; and the many people whose lives Mr. Brinson positively affected, including through mentorship and pro bono legal representation.

In the Government's estimation, the promoters are roughly on equal footing with one another. As partners, Mr. Heaphy and Mr. Ferraioli should receive the same sentence. Although Mr. Ferraioli was involved in the "pump and dump" scheme for longer than Mr. Heaphy (seven years versus five years) and accordingly earned more money ($1.25 million versus $719,000), the basic offense conduct was the same for both defendants. Moreover, after that first scheme ended, they both embarked on a new scheme together, and they have strikingly similar personal backgrounds and family circumstances (including young children at home).

Nor should Mr. Heaphy's sentence be materially different than Mr. Del Gado's sentence. Mr. Del Gado's prior conviction is only marginally more of an aggravating

21

factor than Mr. Heaphy's (and Mr. Ferraioli's) sequential involvement in separate fraudulent schemes. Moreover, Mr. Del Gado earned $350,000, which is less than half of what Mr. Heaphy earned and is reflective of the fact that Mr. Heaphy victimized a greater number of investors than Mr. Del Gado did. Hence, there are important ways in which Mr. Heaphy is both more and less culpable than Mr. Del Gado.

Significantly, 78 months of imprisonment is what the Government calculated the top of the Guidelines range to be in just the 2017 Case (post-variance or departure). *See United States v. Thomas Heaphy, Jr.*, No. 3:17cr168(JAM), Plea Agreement (Doc. No. 5) at 7-8. That is, the Government's suggested sentence here represents no incremental punishment for the defendant's misconduct in the 2018 Case, other than a move to the top of the applicable range. The Government believes that to be an appropriate approach in light of, on the one hand, the defendant's apparent contrition, his difficult childhood, and the hardship his incarceration will cause for his family; and on the other hand, the seriousness of the defendant's crimes, the unusually high degree of victim impact, and the need to avoid unwarranted sentencing disparities.

## VII.  Response to Defendant's Sentencing Memorandum

### A.  Overstating the Seriousness of the Offense

The defendant argues that the loss amount overstates the seriousness of the offense. *See United States v. Thomas Heaphy, Jr.*, No. 3:17cr168(JAM), Def.'s Sentencing Mem. (Doc. No. 24) at 26-28 (hereinafter, "Def.'s Mem."). The Court

already has considered, and rejected, this argument in the context of Mr. Brinson's sentencing. There, the Court explained:

> I am not convinced at all that the Sentencing Guidelines overstate the seriousness of the offense. I appreciate the arguments you've made to the contrary. . . . The guidelines, to me, are appropriate here in light of the quantities, the large amounts of money involved, in light of the fact that it was real victims and real lives affected, some of whom are here in this courtroom, and real futures for their children and their grandchildren that were affected by your failings.

*United States v. Corey Brinson*, No. 3:17cr9(JAM), Sentencing Tr. (Doc. No. 31) at 113-14. The same is true in Mr. Heaphy's case. As noted above, in the 2017 Case alone, 2,286 victims lost more than $1,000 (a total of about $16.5 million), and 368 lost $10,000 or more (a total of about $10.8 million). At the highest tier, 42 victims lost $50,000 or more (a total of about $4.5 million). That is real money lost by real people, 800 of whom went to the trouble of submitting impact statements.

## B.     Comparison to Other Cases

Moving away from the Guidelines, Mr. Heaphy also attempts to argue for a lower sentence by cherry-picking particular cases in the Second Circuit where aspects of the crime (for example, loss amount) were similar to this one and where courts imposed below-Guidelines sentences. *See* Def.'s Mem. at 31-33. This is a particularly ineffective and unhelpful effort, and belies the entire purpose of the Guidelines, namely, "the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system." U.S.S.G. § 1A1.3.  Whereas the Commission has reviewed tens of thousands of cases over its lifetime, the defendant has reviewed a handful that he claims support his sentencing argument. Moreover, it goes without

saying that this Court cannot know all of the factors that went into the sentencing considerations of other courts in this district and circuit, and it would be inefficient and likely ineffective to attempt to review the sentencing proceedings in other cases—in particular the personal circumstances of the defendants—to assess whether the case sits as an appropriate comparable case for sentencing purposes.

### C.    Family Circumstances

The Government agrees that the Court should consider Mr. Heaphy's family circumstances under 18 U.S.C. § 3553. But those circumstances are hardly extraordinary. Indeed, *most* of the charged co-conspirators in this case (including Mr. Del Gado, Mr. Ferraioli, Mr. Meissenn, and Mr. Lieberman) have young children at home. Indeed, at the time of his sentencing, Mr. Del Gado had a two-year-old developmentally disabled son. *See United States v. Damian Delgado*, 3:17cr93(JAM), Def.'s Sentencing Mem. (Doc. No. 18) at 42. Likewise, Mr. Heaphy and his co-conspirators have able-bodied spouses who are able to work and care for their children.

## VIII. Conclusion

For the foregoing reasons, the Government respectfully requests that the Court sentence Mr. Heaphy to a period of imprisonment of 78 months, and order him to pay full restitution to his victims.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

AVI M. PERRY
ASSISTANT U.S. ATTORNEY
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
avi.m.perry@usdoj.gov
203-821-3700
Federal Bar No. phv07156

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 26, 2018, a copy of the foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY